## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **JOEL GALARZA, *et al.*,** | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 1:21-00250-N** |
| | ) | |
| **ONE CALL CLAIMS, LLC, *et al.*,** | ) | |
| **Defendants.** | ) | |

## ORDER

This civil action is before the Court on the joint motion for summary judgment under Federal Rule of Civil Procedure 56 (Doc. 100) filed by the Defendants—One Call Claims, LLC (OCC), Kristi Smoot, Kelly Smoot, and Texas Windstorm Insurance Association (TWIA)—and the renewed motion for partial summary judgment under Rule 56 (Doc. 103) filed by the Plaintiffs—Joel Galarza, Vicki Wimberly, and Kathrine Carpenter. Upon due consideration of said motions and their related briefing and evidentiary submissions, the undersigned finds that the Plaintiffs motion is due to be denied, and that the Defendants' motion is due to be granted.[1]

### I.   *Summary Judgment Legal Standards*

"A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine

---

[1] With the consent of the parties, this civil action has been referred to the undersigned Magistrate Judge to conduct all proceedings in this action, including trial; to order entry of final judgment; and to conduct all post-judgment proceedings, in accordance with 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and S.D. Ala. GenLR 73. (*See* Docs. 72, 73).

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'material' if it might affect the outcome of the suit under governing law and it is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ave. CLO Fund, Ltd. v. Bank of Am., N.A.*, 723 F.3d 1287, 1294 (11th Cir. 2013) (quotations omitted). "Summary judgment is only appropriate if a case is 'so one-sided that one party must prevail as a matter of law.' " *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)) (citation omitted). However, a " 'mere scintilla' of evidence is insufficient; the non-moving party must produce substantial evidence in order to defeat a motion for summary judgment." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009) (per curiam). In other words, "there must be enough of a showing that the jury could reasonably find for that party … Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (quotations omitted).

"[C]ourts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." *Jackson v. West*, 787 F.3d 1345, 1352 (11th Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration adopted) (quotations omitted)). *See also Allen*, 121 F.3d at 646 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (quotations omitted)). "The Court 'must avoid weighing

conflicting evidence or making credibility determinations.' " *Ave. CLO Fund*, 723 F.3d at 1294 (quoting *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000)). However, " 'an inference based on speculation and conjecture is not reasonable.' " *Id.* (quoting *Blackston v. Shook & Fletcher Insulation Co.*, 764 F.2d 1480, 1482 (11th Cir. 1985)).

"Where … the non-moving party bears the burden of proof on an issue at trial, the moving party, in order to prevail, must do one of two things: show that the non-moving party has no evidence to support its case, or present 'affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial.' " *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437–38 (11th Cir. 1991) (en banc)). "Once the movant adequately supports its motion, the burden shifts to the nonmoving party to show that specific facts exist that raise a genuine issue for trial." *Dietz v. Smithkline Beecham Corp.*, 598 F.3d 812, 815 (11th Cir. 2010). "For issues on which the non-moving party will bear the burden of proof at trial, the non-moving party must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.' " *Hammer*, 20 F.3d at 1141 (quoting *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993)).

"When the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence that would entitle it to a directed verdict if not

controverted at trial. In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party. If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, comes forward with significant, probative evidence demonstrating the existence of a triable issue of fact." *Four Parcels of Real Prop.*, 941 F.2d at 1438 (citations and quotations omitted).

"Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (per curiam) (quoting *Bricklayers Int'l Union, Local 15 v. Stuart Plastering Co.*, 512 F.2d 1017, 1023 (5th Cir. 1975)[2]). "In practice, cross motions for summary judgment may be probative of the nonexistence of a factual dispute, but this procedural posture does not automatically empower the court to dispense with the determination whether questions of material fact exist…" *Ga. State Conf. of NAACP v. Fayette Cty. Bd. of Comm'rs*, 775 F.3d 1336, 1345 (11th Cir. 2015) (citation and quotations omitted). "[W]hen both parties proceed on the same

---

[2] On "October 1, 1981 pursuant to the Fifth Circuit Court of Appeals Reorganization Act of 1980, P.L. 96-452, 94 Stat. 1995, … the United States Court of Appeals for the Fifth Circuit was divided into two circuits, the Eleventh and the 'new Fifth.'" *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc). "The Eleventh Circuit, in the *en banc* decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981." *Smith v. Shook*, 237 F.3d 1322, 1325 n.1 (11th Cir. 2001) (per curiam).

legal theory and rely on the same material facts the court is signaled that the case is ripe for summary judgment. Where, … however, the parties disagree as to the facts and take inconsistent legal theories the mere filing of cross motions for summary judgment does not warrant the entry of such judgment." *Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "The nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." *Allen*, 121 F.3d at 646 (quotation omitted). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Id.* (quotation omitted). "Conclusory allegations and speculation are insufficient to create a genuine issue of material fact." *Valderrama v. Rousseau*, 780 F.3d 1108, 1112 (11th Cir. 2015) (citing *Cordoba v. Dillard's Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.")). Importantly, " '[t]here is no burden upon the district court to distill every potential argument that could be made based on the

materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.'" *Solutia, Inc. v. McWane, Inc.*, 672 F.3d 1230, 1239 (11th Cir. 2012) (per curiam) (quoting *Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (en banc)).

## II.    *Facts on Summary Judgment*

Defendant Texas Windstorm Insurance Association ("TWIA") was created by the Texas legislature in 1971 to provide wind and hail insurance to the Texas coast. (*See* Doc. 1 [Complaint] ¶ 5, PageID.2; Doc. 70 [TWIA Answer] ¶ 5, PageID.78). Defendant One Call Claims, LLC ("OCC") is an outsourcing company for insurance claims services that matches insurance companies' needs with OCC's roster of licensed, experienced adjusters and examiners. (Doc. 83-1 [DeVilbiss 1/20/2023 Decl.[3]] ¶ 4, PageID.159; Doc. 99-3 [Kristi Smoot 4/12/2023 Decl.[4]] ¶ 2, PageID.726). TWIA had a service agreement with OCC, under which OCC provided TWIA with examiner and adjuster support needed to investigate and adjust claims. (Doc. 83-1 ¶ 5, PageID.159; Doc. 99-3 ¶ 3, PageID.726).

In 2017, TWIA called on OCC to obtain additional adjuster and examiner services to deal with a spike in claims in the aftermath of Hurricane Harvey. (Doc.

---

[3] Charles Edward "Chip" DeVilbiss has been employed by TWIA since November 2013, served as Senior Claims Manager from November 2015 to January 2023, and is currently Director of Litigation and Disputed Claims. (Doc. 99-1 ¶ 2, PageID.719).

[4] Defendant Kristi Smoot has been employed with OCC since 2011 and is currently its President. (Doc. 99-3 ¶ 2, PageID.726).

83-1 ¶ 6, PageID.159; Doc. 99-3 ¶ 4, PageID.726). OCC engaged each of the Plaintiffs as examiners and assigned them to TWIA under the service agreement between the two entities. (Doc. 99-1 [DeVilbiss 4/12/2023 Decl.]¶ 4, PageID.719-720; Doc. 99-3 ¶ 5, PageID.727). The engagement contracts between OCC and the Plaintiffs classified the Plaintiffs as independent contractors, and specified that their engagements were "temporary" in nature. (Doc. 83-2, PageID.171-172, 175, 177-179, 182; Doc. 84-2, PageID.193-194, 197).

Due to its unique requirements as a legislatively-created "insurer of last resort"—including "deadlines[,] a required ethics policy[,]" and policy terms that differ from those offered by regular marketplace insurance companies—TWIA administers a mandatory certification process for insurance examiners to ensure they are "familiar with the legal requirements applicable to TWIA and the terms of TWIA's insurance policies." (Doc. 99-1 ¶ 9, PageID.721). However, neither TWIA nor OCC trained the Plaintiffs on how to perform the basic skills or functions of an examiner. (*Id.* ¶ 10; Doc. 99-3 ¶ 14, PageID.728). Prior to being assigned to TWIA, each Plaintiff was a licensed insurance adjuster with experience as an insurance examiner. (Doc. 99-1 ¶ 10, PageID.721).

The Plaintiffs' work for TWIA "included communicating with insureds, reviewing factual information regarding damage estimates, and evaluating and making recommendations regarding coverage and value of claims." (*Id.* ¶ 11). They also handled claims during alternative dispute resolution proceedings—to which TWIA had the option of requiring policyholders to submit as a prerequisite to filing

suit if a claim was partially or fully denied—and "had authority to settle claims." (*Id.* ¶ 12). Additionally, Galarza and Carpenter handled insurance claims involved in litigation, which included making recommendations regarding such claims, assisting TWIA's legal counsel, and verifying TWIA's factual representations provided in discovery. (*Id.* ¶ 13, PageID.722).

OCC invoiced TWIA for each day of services provided by the Plaintiffs, and paid them day rates ranging from $500 to $1,200. (*Id.* ¶¶ 5-6, PageID.720; Doc. 99-3 ¶ 11, PageID.728). TWIA did not record or track the hours worked by OCC examiners, including the Plaintiffs, and, subject to timely processing claims, OCC examiners were free to choose when they started and ended work for the day, and took lunch. (Doc. 99-1 ¶¶ 5-6, PageID.720). Galarza and Wimberly were allowed to work remotely for the most part, while Carpenter chose to divide her time between remote work and working from TWIA's offices in Austin, Texas. (*Id.* ¶ 16, PageID.722). TWIA did not monitor the Plaintiffs' remote activities, nor did it require them to report their exact hours worked. (*Id.* ¶ 18, PageID.723). The Plaintiffs were responsible for providing their own workspaces, internet service, and equipment (e.g., cell phones, computers) for remote work. (*Id.* ¶ 19).

Galarza worked for OCC and TWIA from September 2017, until he voluntarily resigned in August 2019. (Doc. 99-3 ¶ 10, PageID.728; Doc. 101-1 [1st Galarza Decl.] ¶ 2, PageID.755). Wimberly and Carpenter quit working for TWIA on or about February 15 and August 30, 2019, respectively. (Doc. 99-3 ¶ 10, PageID.728).

### III.    *Analysis*

### a.    **Motions for Summary Judgment**

The complaint alleges that the Plaintiffs regularly worked in excess of 40 hours a week during their engagements with the Defendants, and that the Defendants' day-rate compensation plan deprived them of overtime pay they were due under the Fair Labor Standards Act as the Defendants' employees. The Defendants, however, argue that the Plaintiffs were not acting as covered "employees" under FLSA, but were instead "independent contractors" exempt from FLSA protections. The parties have cross-moved for summary judgment as to their respective positions on this issue. Upon careful consideration, the undersigned agrees with the Defendants.[5]

"The FLSA's overtime and minimum wage protections…extend only to 'employees,' a term given rough outline by a series of broad definitions in the Act." *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1311 (11th Cir. 2013) (citing 29 U.S.C. §§ 206-207). "An 'employee' is "any individual employed by an employer." *Id.* (quoting

---

[5] Case law is unclear whether "independent contractor" status is an affirmative defense to an FLSA claim that the defendant bears the burden of proving it at trial. *Compare Talbert v. Am. Risk Ins. Co.*, 405 F. App'x 848, 852 (5th Cir. 2010) (per curiam) (unpublished) ("We need not address the plaintiffs' contention that independent contractor status is an affirmative defense to a claim for overtime compensation under the FLSA because, even if we assume that it is, ARI did not waive the defense. ARI asserted, in both its original and amended answers, that Want was an independent contractor and thus was not entitled to payment of overtime compensation under the FLSA."), *with Dejesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 91 n.7 (2d Cir. 2013) ("Dejesus…was not required to plead facts at this stage of the proceedings to support her position that she was a non-exempt employee, that is, one who falls outside of the FLSA's exemptions. A claim of exemption under the FLSA is an affirmative defense, and the employer bears the burden of proof in making any such claim."). However, no party has addressed the issue, and the undersigned finds that the results herein would not change regardless of the answer.

29 U.S.C. § 203(e)(1)). "An 'employer' 'includes any person acting directly or indirectly in the interest of an employer in relation to an employee.' " *Id.* (quoting 29 U.S.C. § 203(d)). "The term 'employ' 'includes to suffer or permit to work.' " *Id.* (quoting 29 U.S.C. § 203(g)). "These 'broad' definitions do not…bring 'independent contractors' within the FLSA's ambit." *Id.* (quoting *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 728-29, 67 S. Ct. 1473, 91 L. Ed. 1772 (1947)).

"A determination of employment status under the FLSA is a question of law[,]" *id.* at 1310, but with "the subsidiary findings being issues of fact." *Patel v. Wargo*, 803 F.2d 632, 634 n.1 (11th Cir. 1986). "To determine whether an individual falls into the category of covered 'employee' or exempted 'independent contractor,' courts look to the 'economic reality' of the relationship between the alleged employee and alleged employer and whether that relationship demonstrates dependence." *Scantland*, 721 F.3d at 1311. "This inquiry is not governed by the 'label' put on the relationship by the parties or the contract controlling that relationship, but rather focuses on whether 'the work done, in its essence, follows the usual path of an employee.' '[P]utting on an "independent contractor" label does not take the worker from the protection of the Act.' " *Id.* (quoting *Rutherford Food*, 331 U.S. 722 at 729) (citation omitted).

The Eleventh Circuit Court of Appeals recognizes the following "factors a[s] relevant to determining whether an individual is an employee or independent contractor" under the "economic reality test":

> (1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;

(2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;

(3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;

(4) whether the service rendered requires a special skill;

(5) the degree of permanency and duration of the working relationship;

(6) the extent to which the service rendered is an integral part of the alleged employer's business.

*Id.* at 1312.

However, the Eleventh Circuit has also stressed that "these six factors are not exclusive and no single factor is dominant." *Id.*[6] " 'The weight of each factor depends on the light it sheds on the putative employee's dependence on the alleged employer, which in turn depends on the facts of the case.' " *Scantland*, 721 F.3d at 1312 n.2 (quoting with approval *Santelices v. Cable Wiring*, 147 F. Supp. 2d 1313, 1319 (S.D. Fla. 2001) (Jordan, J.)). "While these factors serve as guides, the overarching focus of the inquiry is economic dependence"—that is, "on whether an individual is 'in business for himself' or is 'dependent upon finding employment in the business of others.' " *Scantland*, 721 F.3d at 1312 (quoting *Mednick v. Albert Enters., Inc.*, 508 F.2d 297, 301-02 (5th Cir. 1975)). *See also Brock v. Mr. W Fireworks, Inc.*, 814 F.2d

---

[6] "The first five factors derive from *Usery*[ *v. Pilgrim Equip. Co.*, 527 F.2d 1308 (5th Cir. 1976)], the sixth from *Rutherford Food*…'The factors simply summarize the matters deemed relevant by the Supreme Court in *Bartels v. Birmingham*, 332 U.S. 126, 130, 67 S. Ct. 1547, 91 L. Ed. 1947 (1947), *United States v. Silk*, 331 U.S. 704, 716, 67 S. Ct. 1463, 91 L. Ed. 1757 (1947), and *Rutherford Food*, 331 U.S. at 729, 67 S. Ct. 1473, to help gauge the degree of dependence of an alleged employee on the business with which they are connected.' " *Scantland*, 721 F.3d at 1312 n.2 (quoting *Santelices v. Cable Wiring*, 147 F. Supp. 2d 1313, 1319 (S.D. Fla. 2001)).

1042, 1054 (5th Cir. 1987) ("Economic dependence is *not* conditioned on reliance on an alleged employer for one's primary source of income, for the necessities of life. Rather, the proper test of economic dependence mandates consideration of all the factors, and in light of such consideration examines whether the workers are dependent on a particular business or organization *for their continued employment* in that line of business." (quotation omitted)). "The test is not one which allows for a simple resolution of close cases. However, the lesson taught by the Supreme Court[] is that any formalistic or simplistic approach to who receives the protection of [the FLSA] must be rejected." *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1311 (5th Cir. 1976). *See also Carrell v. Sunland Const., Inc.*, 998 F.2d 330, 334 (5th Cir. 1993) ("[D]etermination of employee status is very fact dependent[,]" and "with most employee-status cases, there [will be] facts pointing in both directions."); *Thibault v. Bellsouth Telecommunications, Inc.*, 612 F.3d 843, 848 (5th Cir. 2010) ("The determination of whether an individual is an employee or independent contractor is highly dependent on the particular situation presented.").[7]

Thus, while the undersigned's analysis is guided by the six *Scantland* factors,[8] the undersigned "view[s] the subsidiary facts relevant to each factor through the lens

---

[7] A court's finding in one case that a plaintiff practicing a particular vocation was an "independent contractor" does not mandate such a finding for workers with the same or similar vocations in other cases. *See Thibault*, 612 F.3d at 848 ("We do not hold that *all* splicers are always independent contractors. Indeed, the nature of this analysis suggests that in some cases splicers might be employees."); *Carrell*, 998 F.2d at 334 (explaining how welders found to be independent contractors in that case differed from welders found to be employees in a prior case).

[8] The parties' briefing on the employee-independent contractor issue is framed

of 'economic dependence' and whether they are more analogous to the 'usual path' of an employee or an independent contractor." *Scantland*, 721 F.3d at 1312.

**(1)    The nature and degree of the alleged employer's control as to the manner in which the work was to be performed.**

The Plaintiffs, citing *Villarreal v. Woodman*, 113 F.3d 202 (11th Cir. 1997), argue that "[t]he Eleventh Circuit considers the following factors, among others, relevant to the control inquiry: 'whether the alleged employer (1) had the power to hire and fire the employee, (2) supervised and controlled employee work schedules and conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.' " (Doc. 103, PageID.1026 (quoting *Villarreal*, 113 F.3d at 205). While the presence of those factors is certainly indicative of "employee" status generally, they are of limited value in differentiating "employees" from "independent contractors."

*Villareal* did not involve an employee-independent contractor inquiry, but only the more basic question of whether or not an individual was an entity's "employee" at all.[9] The *Villareal* factors would seemingly apply to all but the most independent of "independent contractors"—after all, even if they are not "employees" for FLSA purposes, independent contractors are still employed by those they contract with in some sense of the word, and are therefore expected to be under some degree of "control" of the contracting entity. *Cf. Scantland*, 721 F.3d at 1311 (characterizing an

---

around the *Scantland* factors.

[9]  The same is true for *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465 (9th Cir. 1983), the case from which *Villareal* drew those factors.

independent contractor as "exempted" from "the category of covered 'employee'" under the FLSA); *Usery*, 527 F.2d at 1311 n.6 ("The terms 'independent contractor,' 'employee,' and 'employer' are not to be construed in their common law senses when used in federal social welfare legislation."); *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 347 (5th Cir. 2008) ("Despite the semantic inconsistency, it is legally possible to be an employee for purposes of the FLSA and an independent contractor under most other statutes.").[10]

Eleventh Circuit case law is clear that, for purposes of differentiating "independent contractors" from "employees," the inquiry into "control" concerns whether "'it shows an individual exerts such a control over a meaningful part of the business that she stands as a separate economic entity.'" *Scantland*, 721 F.3d at 1313 (quoting *Usery*, 527 F.2d at 1312-13). Put another way, "control" turns on whether the worker has a "viable economic status that can be traded to other…companies…" *Usery*, 527 F.2d at 1312. *See also id.* at 1315 (control concerns whether a worker, "as

---

[10] The Eleventh Circuit, albeit in an unpublished decision, has previously declined to apply similar factors from *Aimable v. Long & Scott Farms*, 20 F.3d 434 (11th Cir. 1994), in an employee-independent contractor inquiry, finding they were more relevant to a "joint employment" inquiry—in other words, whether a worker was an entity's "employee" at all. *Yoder*, 2023 WL 3151107, at *2 n.3. *Aimable* itself noted that most of the same "employee-independent contractor" factors that would later be applied in *Scantland* were not relevant to the "joint employer" inquiry. 20 F.3d at 443-45. *See also Layton v. DHL Exp. (USA), Inc.*, 686 F.3d 1172, 1176 (11th Cir. 2012) ("In *Aimable*, we also found three factors to be irrelevant to our analysis: (1) the opportunity for profit and loss, (2) permanency and exclusivity of employment, and (3) the degree of skill required to perform the job. 20 F.3d at 443–44. We explained that these three factors only distinguished whether one was an employee or an independent contractor. *See id.* Because it had been determined that the farm workers were employees of the contractor, there was no need to evaluate whether hallmarks of an independent-contractor relationship existed. *See id.*").

an economic entity, is capable of doing business elsewhere"). While a "lack of supervision over minor regular tasks cannot be bootstrapped into an appearance of real independence[,]" *id.*, an alleged employer's control over basic work parameters does not speak to control over "the *manner* in which the work is to be performed." *Yoder v. Fla. Farm Bureau*, No. 22-11135, 2023 WL 3151107, at *3 (11th Cir. Apr. 28, 2023) (per curiam) (unpublished).

For example, in *Yoder*, the Eleventh Circuit panel rejected the plaintiff insurance agents' contention that their alleged employer's "control over aspects like what products can be sold and what the commission rate is" reflected control over "the *manner* in which the work is to be performed." *Id.* The panel instead found that the record "reflect[ed] that the [plaintiffs were] free to control the manner in which they work[ because] they pursued their own leads, determined their own methods for developing sales, and hired and maintained support staff if they determined a need for assistance." *Id.*[11] Similarly, in *Nieman v. National Claims Adjusters, Inc.*, 775 F.

---

[11] *See also Yoder v. Fla. Farm Bureau Cas. Ins. Co.*, No. 1:19-CV-70-AW-GRJ, 2022 WL 1055184, at *3-4 (N.D. Fla. Mar. 9, 2022), *aff'd sub nom. Yoder*, 2023 WL 3151107 ("[T]he limits Farm Bureau imposed as to products sold, prices, geography, and so forth are not the types of limits that demonstrate 'control' over sales agents. There will always be parameters of work to be performed—even independent contractors' work. A homeowner who hires a house painter gets to decide things like paint color, which rooms get painted, and by what date. That does not suggest employee status. []The same is true for performance measures…[W]orkers who fall short of job expectations—whether employees or independent contractors—always face consequences. Returning to the example above, the homeowner gets to require a certain level of performance (one coat or two, for example), and he expects the painter to comply. []The control factor pertains to control over 'the manner in which the work is to be performed,' *Scantland*, 721 F.3d at 1312—and 'manner' speaks to how assigned work is accomplished, not who sets the contours of that assigned work.").

App'x 622 (11th Cir. 2019) (per curiam) (unpublished), the panel cited the following

in holding that the control factor weighed in favor of independent contractor status

for the plaintiff insurance adjuster:

> Nieman controlled when he started work for National and for how long,
> how many assignments he took from National, and when he received
> those assignments. In other words, he controlled his schedule. He
> admitted in his complaint that after he began receiving assignments…,
> he set up his own appointments and inspections. He also controlled the
> geographic location within which he took assignments. Although he
> alleged that National controlled the software that he used, the methods
> by which he completed his reports, and in some ways, how he performed
> the job, he ultimately controlled how and when he completed the
> assignments and whether he would take on more or less of them,
> showing that he was essentially in business for himself.

775 F. App'x at 625 (quotation omitted).[12]

As described by TWIA, without substantive dispute, the Plaintiffs' work as

insurance examiners included (1) communicating with insureds, reviewing factual

---

[12] *See also Freund v. Hi-Tech Satellite, Inc.*, 185 F. App'x 782, 783 (11th Cir. 2006)
(per curiam) (unpublished) ("The district court determined that Hi–Tech exerted very
little control over Mr. Freund. Hi–Tech scheduled the installation appointments but
Freund could re-schedule them. The specific details about how Freund carried out his
duties were left to him with the exception that 1) he was not allowed to perform any
additional services that were not paid for by the customers without Hi–Tech's
approval; 2) he had to wear a Hi–Tech shirt during appointments; 3) he had to follow
certain minimum specifications for the installations; and 4) he had to call Hi–Tech to
confirm he had completed the installation and report any problems that had arisen.
The district court found that Hi–Tech's interest in Freund's work was the end result
of customer satisfaction, and not with the day-to-day regulation of his work habits,
hours worked or work methods.") (affirming district court's bench trial finding that
plaintiff was an independent contractor); *Parrish v. Premier Directional Drilling,
L.P.*, 917 F.3d 369, 381 (5th Cir. 2019) ("[T]he control factor leans in favor of IC status.
Premier did not dictate how plaintiffs completed the directional-drilling calculations.
This is similar to the situation in *Thibault*, in which the worker's supervisors 'never
specified how [he] should do [his primary task:] splicing' high-voltage cables.
*Thibault*, 612 F.3d at 847.").

information regarding damage estimates, and evaluating and making recommendations regarding coverage and value of claims; (2) handling claims during alternative dispute resolution proceedings, with authority to settle claims; and (3) as to Galarza and Carpenter, handling claims involved in litigation, including making recommendations, assisting TWIA's legal counsel, and verifying TWIA's factual representations provided in discovery. (Doc. 99-1 ¶¶ 11-13, PageID.721-722). The functions of an insurance examiner for TWIA requires the exercise of discretion and judgment. (*Id.* ¶ 14, PageID.722).

Each Plaintiff was a licensed insurance adjuster with experience as an insurance examiner prior to being assigned to work for TWIA. (*See* Doc. 99-1 ¶ 10, PageID.721). TWIA and OCC[13] have both averred, through their respective agents, that neither entity trained the Plaintiffs in the basic skills or functions of an insurance examiner, nor did they control or direct the manner in which the Plaintiffs performed their work as examiners. (*See* Doc. 99-1 ¶¶ 10, 14, PageID.721-722; Doc. 99-3 ¶¶ 14-15, PageID.728). TWIA asserts that "[t]he number of days worked per week depended on workload and the [Plaintiffs'] preferences[]" and that it "did not record or track the hours worked" by the Plaintiffs, who "were free to choose when they started work for the day, took lunch, and ended work for the day[,]" "[s]ubject to timely processing claims…" (Doc. 99-1 ¶¶ 6 7, PageID.720). Additionally, both TWIA and OCC aver that

---

[13] Kristi and Kelly Smoot are being sued as additional "employers" under the FLSA as persons "acting directly or indirectly in the interest of" OCC. *See* 29 U.S.C. § 203(d); (Doc. 1 ¶ 13, PageID.3-4). As the Plaintiffs have not differentiated OCC's FLSA liability from that of the Smoots, the Court's analysis as to the claims against OCC also apply to the claims against the Smoots.

the Plaintiffs "were free to market their services" to other insurance companies during their engagement. (*Id.* ¶ 21, PageID.724; Doc. 99-3 ¶ 7, PageID.727). As an example, in October 2017 Carpenter left her assignment with TWIA for "a better opportunity[,]" returned to TWIA approximately 3 months later, then left again in the fall of 2019 to work on insurance claims related to Hurricane Dorian. (Doc. 99-1 ¶ 22, PageID.724).

None of the evidence cited by the Plaintiffs in arguing the "control" factor directly contradicts the Defendants' assertions that they did not control or direct how the Plaintiffs performed the work of insurance examiners. The Plaintiffs point to evidence indicating that TWIA and OCC exercised some control over their work schedules. This evidence includes an email chain between TWIA and OCC employees (Doc. 105-1) discussing the possibility of ending Wimberly's engagement with TWIA if she continued to work on Sundays without supervisor authorization, and a provision in the Plaintiffs' TWIA engagement agreements stating that their work "includ[ed] up to 10 hours per day with hours determined by the client." However, even if TWIA could have made the Plaintiffs work up to 10 hours a day, that does not contradict its sworn testimony that the Plaintiffs could choose when they started and ended work for the day, and took lunch—that is, they still exercised control over their daily work schedules to achieve TWIA's time demands. Prohibiting work on Sundays is also not indicative of control over the "manner" in which the Plaintiffs performed as insurance examiners. The time controls cited by the Plaintiffs are a far cry from

those in *Scantland* that the Eleventh Circuit found indicative of employee-status "control," *see* 721 F.3d at 1313-14.

The Plaintiffs also argue that the Defendants controlled the manner and mode in which the Plaintiffs were paid; dictated what the Plaintiffs could wear; required them to identify themselves as TWIA representatives when addressing claimants; required them to notify an OCC employee of absences' required OCC manager approval to be released from their assignments; required the Plaintiffs to keep records of time and dates worked.[14] However, these are more akin to work "parameters" that do not suggest control over the manner in which the work is performed.[15] The same is true of TWIA's requiring examiners to pass a certification

---

[14] TWIA have averred that it "did not record or track the hours worked by independent contractors," including the Plaintiffs. (Doc. 99-1 ¶ 7, PageID.720). Claiming that TWIA made them install software on their computers and use its computer network for remote access, the Plaintiffs insinuate that TWIA could have tracked their work activities, though they stop short of asserting TWIA in fact did so. Such speculation cannot rebut TWIA's direct assertion to the contrary. Regardless, even if TWIA were tracking the Plaintiffs hours and/or movements, they have not shown how it affected the manner in which they functioned as examiners.

[15] *See Carrell*, 998 F.2d at 334 (holding—despite the presence of "[s]everal facts weigh[ing] in favor of employee status[,]" such as the defendant's control over the plaintiff welders' schedules ("including the timing of their breaks") and work crew assignments, and "rarely negotiable" hourly rates of pay—that the plaintiffs were independent contractors where, *inter alia*, the defendant "had no control over the methods or details of the welding work"); *Hargrave v. AIM Directional Servs., L.L.C.*, No. 21-40496, 2022 WL 1487020, at *3 (5th Cir. May 11, 2022) (per curiam) (unpublished) ("Hargrave places great emphasis on the fact that AIM forced him to comply with safety protocols and procedures, and strongly encouraged him to wear personal protective equipment with the AIM logo on it while on the job. But as the district court observed, encouraging workers to wear a hard-hat with an AIM logo and mandating compliance with "safety policies and procedures that are generally required for safe operations on an oil-drilling site is not the type of control that counsels in favor of employee status." (quotations omitted)).

course familiarizing them with the legal requirements applicable to TWIA and the terms of TWIA's insurance policies—even independent contractors must be expected to comply with some "ground rules" when working for a specific customer.[16]  The fact that the Plaintiffs had to consult with and get approval from TWIA to make settlement offers and resolve claims also does not speak to control over the "manner" in which the Plaintiffs participated in mediations or otherwise administered claims. A customer can be expected to have some approval over an independent contractor's final product, especially when the "final product" here was potentially TWIA's own money to pay claims. As long as the customer does not control the "manner" in which that final product is produced, it is not exercising the "control" more expected of an employer.

Additionally, the Plaintiffs claim that TWIA's Ethics Policy forbid them from seeking outside employment during their engagements with TWIA, though the Defendants correctly respond that the policy only forbade "outside employment or business ventures that interfere or conflict with the[ Plaintiffs'] duties and/or obligations to [TWIA]." (Doc. 105-18, PageID.1255). This indicates that the Plaintiffs had at least some opportunity to work for other companies at the same time they

---

[16] *See Parrish*, 917 F.3d at 381–82 ("[A]lthough plaintiffs were provided an already-designed well plan, they made that plan work. In *Thibault*, the company provided the 'blueprints', yet the worker was not held to be an employee. [612 F.3d] at 847, 851. []Nor are we persuaded by the mandated format of reports. At the very least, turning in reports in the way a client wants them is good-client service. In any event, 'meeting clients' specifications and keeping clients informed of job progress is consistent with the "usual path" of an [IC]'. *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1315 (11th Cir. 2013).").

worked for the Defendants. *See Parrish*, 917 F.3d at 382 ("non-disclosure agreement [that] does not require exclusive employment" not the type of control indicating employee status (citing *Usery*, 527 F.2d at 1312–13)).

In sum, the "control" factor weighs in favor of "independent contractor" status.

### (2) The alleged employee's opportunity for profit or loss depending upon his managerial skill.

"Routine work which requires industry and efficiency is not indicative of independence and nonemployee status." *Usery*, 527 F.2d at 1314. "[C]onsiderations such as business sense, salesmanship, personality and efficiency [are not] probative of employee status. The key…ingredient…is initiative." *Id.* "An individual's ability to earn more by being more technically proficient is unrelated to an individual's ability to earn or lose profit via his managerial skill, and it does not indicate that he operates his own business. As the Supreme Court has explained, a job whose profits are based on efficiency is 'more like piecework than an enterprise that actually depend[s] for success upon the initiative, judgment or foresight of the typical independent contractor.' " *Scantland*, 721 F.3d at 1317 (quoting *Rutherford Food*, 331 U.S. at 730).

It is undisputed that the Plaintiffs were compensated per day worked, at rates set by OCC. *See Scantland*, 721 F.3d at 1317 (technicians' inability to "negotiate or otherwise determine the rates they were paid for jobs" indicative of "employee" status). However, "[i]n evaluating this factor, it is important to determine how the workers' 'profits [depend] on their ability to control their own costs'." *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 384 (5th Cir. 2019) (quoting *Carrell*, 998 F.2d at 334). A worker's ability to "[i]ncreased profits by controlling costs (repairs,

supply costs, food, water, housing, etc.)" is an exercise of "managerial skill" indicative of an independent contractor. *Thibault*, 612 F.3d at 848. Here, the Defendants point out, and the Plaintiffs do not dispute, that the Plaintiffs were "responsible for all personal and professional expenses incurred" while performing their assignments under their agreements with OCC, including "automobile and other travel expenses[,] meals[,] office areas and lodging expenses…" (Doc. 1-1 ¶ 2(b), PageID.17-18; Doc. 99-3 ¶ 8, PageID.727-728). When remote working, the Plaintiffs were also responsible for providing their own equipment, work space, Internet and cell phone services, etc. (Doc. 99-1 ¶ 19, PageID.723). Thus, as the Defendants persuasively argue, the Plaintiffs' exercise of managerial control to minimize such expenses in performing their assignments would lead to increased profits by allowing them keep more of the money they were paid each day for those assignments. The opportunity to claim business expenses as tax deductions, as all Plaintiffs admit they did (*see* Doc. 92-1, PageID.634; Doc. 92-2, PageID.642; Doc. 92-3, PageID.650), offered further opportunity to exercise "managerial skill" over such expenses. *See Hobbs v. Petroplex Pipe & Constr., Inc.*, 946 F.3d 824, 832–33 (5th Cir. 2020) ("[T]here was testimony that the pipe welders controlled the costs of, for example, their business equipment; and moreover, they took advantage of tax deductions for such business related expenses. We have previously concluded that similar evidence supported a finding of independent contractor status. *See, e.g.*, *Parrish*, 917 F.3d at 384–85; *Thibault*, 612 F.3d at 848–49."); *Hargrave v. AIM Directional Servs., L.L.C.*, No. 21-40496, 2022 WL 1487020, at *3 (5th Cir. May 11, 2022) (per curiam) (unpublished) ("While AIM had

a set day rate for the directional drillers it contracted with, Hargrave still 'made decisions affecting [his] expenses.' *Parrish*, 917 F.3d at 384. Indeed, Hargrave admits that he paid 'for some of the vehicles, tools, equipment, and consumables" necessary to perform his work for AIM. *See Carrell*, 998 F.2d at 332 (welders' profits hinged on their ability 'to minimize welding costs' given that they were responsible for 'all costs associated with ... their welding equipment'). Hargrave was then able to deduct these expenses from his taxes. *See Parrish*, 917 F.3d at 384–85 (deducting business expenses is indicative of independent contractor status)." (footnote omitted)).

Based on the foregoing, the "opportunity for profit or loss" weighs in favor of independent contractor status for the Plaintiffs, though not heavily.

**(3)    The alleged employee's investment in equipment or materials required for his task, or his employment of workers**

In arguing this factor, the Plaintiffs assert that the Defendants' relative investment must be compared to theirs. (*See* Doc. 103, PageID.1027). The case law is unclear whether they are correct on this point. *Compare Yoder*, 2023 WL 3151107, at *3 ("In analyzing th[e investment or hiring] factor, *Scantland* focused on whether the alleged employee's ability to hire employees was illusory—an optional investment. [721 F.3d] at 1316–17. *Usery* focused on the employees' risk capital. *See Usery*, 527 F.2d at 1313–14. Neither of the cases compared the investment between the alleged employer and employee. Thus, a reading of [Eleventh Circuit] precedent reveals that courts may analyze investments the alleged employee has the ability to make and may also consider the alleged employee's risk capital."), *with Parrish*, 917 F.3d at 383 (explaining the Fifth Circuit's "side-by-side comparison method," derived from *Usery*

and other cases, in which each worker's individual investment is compared to that of the alleged employer). Nevertheless, even if a "side-by-side comparison" is appropriate in evaluating this factor, that approach "does not always necessitate a holding of employee status." *Parrish*, 917 F.3d at 383.

The Plaintiffs do not contest the Defendants' assertion that "[t]he administration of insurance claims is not a capital intensive endeavor and is accomplished with computers, telephones, and software[,]" or that they were required to provide their own equipment and workspaces while working remotely. (Doc. 99- ¶¶ 15, 19, PageID.722-723). While the Plaintiffs aver that TWIA provided them equipment to use in the course of their work, there is no indication that TWIA required them to use it, or that the Plaintiffs were unable to perform their jobs as insurance examiners absent the provision of that equipment. *But see Usery*, 527 F.2d at 1314 ("All investment or risk capital is provided by Pilgrim. It furnishes the station, cash register, fixtures, security devices, counters, racks, hangers, bags, tags, receipts, utilities, telephone, and liability insurance. The 10 dollar per-year rental set up for these capital items is so nominal as to be de minimis. But for Pilgrim's provision of all costly necessities, these operators could not operate."). Given that the insurance examining profession is not capital intensive, and given that TWIA and OCC were already established businesses prior to engaging the Plaintiffs, even if the "investment" factor favors employee status, it merits little weight in the present "economic reality" test. *See Parrish*, 917 F.3d at 383 (finding that "investment" factor favored employee status but according it "little weight, in the light of the nature of

the industry and the work involved[,]" and "in the light of the other summary-judgment-record evidence supporting IC-status").

### (4)    Whether the service rendered requires a special skill.

It is undisputed that the Plaintiffs were required to be licensed insurance professionals in order to perform their work for the Defendants. *See Nieman*, 775 F. App'x at 625 ("The fourth factor—whether the service required a special skill—also weighs in favor of independent contractor status because his job required a license."); *Yoder*, 2023 WL 3151107, at *3 ("We agree…that licensure implicates special skill of an independent contractor…"); *Talbert v. Am. Risk Ins. Co.*, 405 F. App'x 848, 856 (5th Cir. 2010) (per curiam) (unpublished) (fact that plaintiff was a licensed professional and bore the cost of licensing herself was indicative of "independent contractor" status). Further, the Plaintiffs learned how to perform the basic functions of insurance examiners prior to going to work for the Defendants. *But see Scantland*, 721 F.3d at 1318 ("Plaintiffs were clearly skilled workers. The meaningfulness of this skill as indicating that plaintiffs were in business for themselves or economically independent, however, is undermined by the fact that Knight provided most technicians with their skills." (footnote omitted)). This factor weighs solidly in favor of "independent contractor" status.

### (5)    The degree of permanency and duration of the working relationship.

The Plaintiffs do not dispute that they were engaged to help handle the substantial spike in claims by TWIA policyholders following Hurricane Harvey, which is indicative of a temporary working relationship with TWIA. *See Nieman*, 775

F. App'x at 625 ("The fifth factor—the degree of permanency and duration of the working relationship—weighs in favor of independent contractor status because Nieman alleged that National engaged him to handle claims arising from Hurricane Irma and acknowledged that he was hired for a 'special project.' "). As for OCC, the Plaintiffs' engagement contracts specified that their engagements were temporary, *see Talbert*, 405 F. App'x at 856 ("[I]t is undisputed that, from the beginning of her relationship with ARI, Want was aware that her position was expressly temporary."), and that, upon the completion of each OCC assignment, "the Parties may enter into and agree to subsequent Assignments subject to the same terms and conditions." (Doc. 83-2, PageID.175, 182; Doc. 84-2, PageID.197). Moreover, it was up to the Plaintiffs to "advise OCC if [they] wishe[d] to become eligible for future temporary engagements immediately after the completion of [the last] temporary assignment[,]" (*id.*), and it does not appear that any of the Plaintiffs accepted, or attempted to negotiate, any other assignments with OCC apart from those for TWIA's Hurricane Harvey claims. The assignment-by-assignment nature of the Plaintiffs' engagement with OCC, with the Plaintiffs having control over whether they would accept further assignments, is not indicative of the "permanence" and "duration" evidencing employee status. *But see Scantland*, 721 F.3d at 1318 ("Named plaintiffs worked for Knight for an average of more than five years. Their contracts were for year terms, were automatically renewed, and were terminable only with thirty days' notice. These facts suggest substantial permanence of relationship."). The "permanency and

duration" factor weighs in favor of the Plaintiffs being independent contractors for both TWIA and OCC.

### (6)    The extent to which the service rendered is an integral part of the alleged employer's business

The Defendants assert that this factor "is neutral in the context of Plaintiffs' services." (Doc. 100, PageID.741). However, contrary to the Defendants' argument, *Neiman* does not suggest this to be a categorical rule for insurance examiner. Rather, the failure to find the "integral part" factor significant in that case was due to a dearth of relevant allegations in that particular complaint. *See* 775 F. App'x at 625.

The undersigned agrees with the Plaintiffs that this factor strongly weighs in favor of employee status with regard to OCC, since providing insurance examiner and adjuster services to insurance companies appears to be its entire business. Without independent professionals like the Plaintiffs, OCC would have no business to offer. This factor also weighs in favor of employee status with regard to TWIA, though less strongly. While TWIA cannot reasonably dispute that insurance examining is an important part of its business, the undisputed fact that TWIA engaged the Plaintiffs for a limited purpose—to assist handling the sharp uptick in claims following Hurricane Harvey—reasonably suggests that TWIA is normally able to get by with its own in-house examiners, thus making the Plaintiffs' services less integral to TWIA's overall business. *Cf. Scantland*, 721 F.3d at 1319 ("The integral role played by technicians in Knight's business shows that the arrangement follows more closely that of an employer-employee relationship than an independent contractor dynamic. If Knight had truly outsourced such a large portion of its business, as would be true

if plaintiffs were independent contractors, then the company would retain far less control over the business. However, because of Knight's concern with the quality of the services it provides through this arrangement, it does, as one might expect, control the relationship in much the same way a company would control its employees.").

### (7)    Weighing the Factors

As stated above, four of the six *Scantland* factors weigh in favor of "independent contractor" status for the Plaintiffs, one factor decidedly does not, and the last factor, to the extent it might weigh in favor of "employee" status, merits little additional weight on that point. *See Yoder*, 2023 WL 3151107, at *3 (affirming district court's summary judgment determination that plaintiffs were independent contractors where four *Scantland* factors favored "independent contractor" status and the remaining two favored "employee" status). Moreover, the undisputed evidence, viewed as a whole, more definitively supports the determination that the Plaintiffs were "in business for themselves" when they worked for the Defendants: all three Plaintiffs were licensed insurance professionals prior to working for the Defendants, and bore the costs of maintaining such licensure; each Plaintiff executed an engagement contract stated that they were "independent contractors,"[17] and that they worked for OCC on an assignment-by-assignment basis; the Plaintiffs were

---

[17] *See Robicheaux v. Radcliff Material, Inc.*, 697 F.2d 662, 667 (5th Cir. 1983) ("[T]he fact that the plaintiff[s]…signed contracts stating that they were independent contractors, *while relevant*, is not dispositive." (emphasis added) (citing, e.g., *Usery*, 527 F.2d at 1315)).

engaged for a specific, temporally limited purpose—to assist with TWIA's surge of claims in the wake of a hurricane; OCC paid Galarza and Wimberly, at least in part, through LLCs they had registered prior to working for the Defendants; the Defendants did not train the Plaintiffs in the basic skills or functions of an insurance examiner, and did not dictate how they were to perform the functions of examiners; and the Plaintiffs were allowed to perform examiner services for other customers so long as it did not interfere with their work for TWIA. Accordingly, because the undisputed evidence of record more supports the determination that the Plaintiffs were "independent contractors" when they worked for the Defendants, the Plaintiffs' renewed motion for summary judgment (Doc. 103) is due to be denied as to their request to be deemed "employees" under the FLSA, and the Defendants' joint motion for summary judgment (Doc. 100) is due to be granted as to their request to deem the Plaintiffs "independent contractors."[18]

### b.    Motion to Strike

The Defendants have filed a motion to strike Galarza's second declaration (Doc. 113) submitted with the Plaintiffs' reply in support of their motion for summary judgment. (Doc. 116). They argue that the declaration contains factual assertions that could and should have been raised as part of the Plaintiffs' renewed motion, rather than as part of the reply when the Defendants could not address them.

---

[18] Because that determination mandates dismissal of the Plaintiffs' FLSA claims in their entirety, the undersigned declines to address the other issues raised in the various motions for summary judgment.

In response, the Plaintiffs do not dispute that they could have provided the information earlier, but claim that it was properly submitted in reply to the Defendants' response to their renewed motion to "contradicts things such as Defendants' denial that they used software to monitor Plaintiffs' work[, a]nd Defendants' contention they had no control over the manner or details of Plaintiffs' work…" (Doc. 118, PageID.1406). This argument rings hollow, however, since the Defendants raised the same contentions in their own motion for summary judgment (Doc. 100), filed the same day as the Plaintiffs' renewed motion, yet the Plaintiffs did not provide the contested information in Galarza's second declaration with their response to the Defendants' motion, instead waiting two weeks later to submit it with their reply. This appears to have been a calculated attempt to save what the Plaintiffs believe to be their strongest evidence of "control" until the Defendants would not have an opportunity to rebut it.

Nevertheless, the motion to strike is due to be found moot, as consideration of the contested information in Galarza's second declaration does not alter the Court's conclusion that the Plaintiffs were "independent contractors" when they worked for the Defendants.

## IV.    *Conclusion*

In accordance with the foregoing analysis, the following is **ORDERED**:

1.  The Defendants' joint motion for summary judgment (Doc. 100) is **GRANTED** as to their request that the Plaintiffs be classified as "independent contractors" for purposes of their FLSA claims, and is otherwise **MOOT**;

2. The Plaintiffs' renewed motion for partial summary judgment (Doc. 103) is **DENIED** as to their request that they be classified as the Defendants' "employees" for purposes of their FLSA claims, and is otherwise **MOOT**;

3. the other pending motions for summary judgment (Docs. 83, 102), and the Defendants' motion to strike (Doc. 116), are **MOOT**;

4. the Plaintiffs' claims and causes of action are **DISMISSED with prejudice**;

5. the final pretrial conference, trial setting, and all other remaining deadlines and settings are **CANCELED**; and

6. Judgment in accordance with this order shall hereafter be set out by separate document, in accordance with Federal Rule of Civil Procedure 58.

   **DONE** and **ORDERED** this the **29th** day of **August 2023**.

                                      */s/ Katherine P. Nelson*
                                      **KATHERINE P. NELSON**
                                      **UNITED STATES MAGISTRATE JUDGE**