FOR PUBLICATION

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-13205
_____

JOEL GALARZA,
VICKI WIMBERLY,
KATHRINE CARPENTER,

*Plaintiffs-Appellants,*

*versus*

ONE CALL CLAIMS, LLC,
KRISTI SMOOT,
KELLY SMOOT,
TEXAS WINDSTORM INSURANCE ASSOCIATION,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Southern District of Alabama
D.C. Docket No. 1:21-cv-00250-N
_____

Before WILLIAM PRYOR, Chief Judge, and LUCK and BRASHER, Circuit Judges.

BRASHER, Circuit Judge:

One Call Claims assigned Joel Galarza, Vicky Wimberly, and Katherine Carpenter to adjust insurance claims for Texas Windstorm Insurance Association following Hurricane Harvey. Now, the workers are suing for unpaid overtime wages that they claim they are entitled to as "employees" under the Fair Labor Standards Act, 29 U.S.C. § 207. The district court determined at summary judgment that the workers were independent contractors instead of employees—and therefore outside the scope of the FLSA. The workers timely appealed.

When we review the conditions of employment to determine employee status, we consider all the relevant circumstances with an eye toward the economic reality of the relationship and whether the workers are economically dependent on the employer. To this end, we have recognized six relevant factors to guide the analysis in these circumstances. *See Scantland v. Jeffrey Knight, Inc.*, 721 F.3d 1308, 1311–12 (11th Cir. 2013). Under that test, we believe a factfinder could determine that the workers were employees covered by the FLSA instead of independent contractors outside its reach. Because a jury could reasonably reach that conclusion, we reverse the district court's summary judgment.

Case 1:21-cv-00250-N    Doc# 130    Filed 10/16/25    Page 3 of 27    PageID# 1520
USCA11 Case: 23-13205    Document: 51-1    Date Filed: 10/16/2025    Page: 3 of 25

23-13205          Opinion of the Court                3

## I.

The Texas legislature created Texas Windstorm Insurance Association to provide wind and hail insurance to the Texas coast. One Call Claims is an outsourcing company for insurance claims that matches insurance companies with its own roster of licensed adjusters. TWIA and OCC (collectively, the companies) had a service agreement under which OCC would provide adjusters to investigate claims. In 2017, TWIA sought additional adjusters from OCC to help dispense claims after Hurricane Harvey, and OCC assigned Galarza, Wimberly, and Carpenter (collectively, the workers) to the matter.

To work in this field, the workers had to be licensed, certified, and trained. Neither TWIA nor OCC trained the workers on the basic skills or functions of the job; instead, they were licensed by Texas and had previous experience in these roles. But working for TWIA imposed additional requirements. As a creature of the Texas legislature, TWIA is subject to statutory obligations that do not bind ordinary insurers in the marketplace. Therefore, TWIA required the adjusters to complete a certification process to ensure that they were familiar with the additional requirements. According to Galarza, TWIA "trained [him] on how it wanted [him] to perform [his] job functions" and "provided [him] with a spreadsheet 'crash course' as an aide to perform [his] job duties as TWIA required." And although the companies state that the workers had the authority to settle claims, the workers insist that they "were

required to consult with and get approval from TWIA before making settlement offers and resolving claims."

The workers and OCC had a contract that generally defined the parameters of the engagement. The agreement described the workers as "independent contractor[s]" who were "temporarily engaged" in "separate and standalone" assignments. This particular assignment for TWIA was for an indefinite duration to be "determined by TWIA." After completing their assignments, the workers and companies could choose to "enter into and agree to subsequent Assignments subject to the same terms and conditions[.]"

The workers' assignments lasted about one and a half to two years. Although they were "free to market their services to insurers other than TWIA," their contracts prohibited them from "[i]nduc[ing] or attempt[ing] to induce any customer, vendor, association, organization or other person or entity to cease doing business with OCC." While adjusting claims for TWIA, the workers did not adjust claims for anyone else. However, Carpenter stopped working for TWIA twice so that she could work for different insurers.

The workers had regimented hours while adjusting claims for TWIA. The contract indicated that they would work "up to 10 hours per day with hours determined by [TWIA]." Galarza stated that he initially worked at TWIA facilities from 8 a.m. to 6 p.m. Monday through Friday and 8 a.m. to 5 p.m. Saturdays and Sundays and that "TWIA had the authority to set [his] work schedule." Furthermore, he was required to keep timesheets and "send [them]

to TWIA for approval." And all workers "had to report any tardies/absences to OCC's Human Resources Manager and to [their] TWIA direct manager," otherwise "OCC had the discretion to deduct up to one day's pay[.]" The workers also claim that TWIA "controlled and directed [the workers'] day-to-day tasks," which TWIA disputes. In either event, TWIA insists that it "did not require them to report their exact hours worked."

During this time, the workers were generally responsible for the expenses they incurred with some exceptions. In particular, they were "responsible for all personal and professional expenses" including state adjusting license fees, business license fees, membership fees and dues, car and travel expenses, and insurance premiums. Because the workers were not from the area, these expenses included "food, lodging, and transportation when working on TWIA's premises." And the workers claimed tax deductions for business expenses incurred in connection with the services they rendered. TWIA claims that by controlling these costs and filing tax deductions, the workers had the opportunity to influence their profit or loss. However, TWIA provided all workers with equipment it required them to use for work. Specifically, it provided identification badges that the workers had to wear while on TWIA premises, work email addresses and signature blocks, computers, and telephones.

After about six or seven months, TWIA underwent a shift to remote work. According to the workers, TWIA told them that they would begin working remotely because TWIA feared it was

"exerting too much control over [them] and [it was] concerned about overtime and lawsuits." But TWIA denies their account. According to TWIA, the transition was due to "limited cubicle space at TWIA's facility and the preferences of the [workers]."

This shift to remote work introduced some new policies. In particular, the workers claim that TWIA "granted [them] remote access . . . to its computer network and applications" and required them to "install software on [their] computer[s] that allowed [TWIA] to monitor" their productivity. According to Galarza, TWIA told him that it was able to track "performance metrics" including "when [the workers] were working, how fast [they] typed, and how many words [they] typed." Nevertheless, TWIA insists that it "did not have the technical capability to monitor the remote activities" of the workers, "did not require them to report their exact hours worked," and "did not require [them] to install software on their computers to monitor them." It also claims that during remote work, the workers "provided their own workspaces and equipment, including computers and cell phones," and that the workers were responsible for "Internet service, cell phone service, power, and other business expenses." Just as was the case when the workers were working on TWIA premises, TWIA claims that the workers "had the opportunity for profit or loss" by managing their expenses and filing tax deductions.

The workers also had different schedules after the shift. TWIA told the workers that they were "only able to be paid for work on Sundays if [they] first had requested permission to do so

from TWIA." If anyone worked on Sundays without proper approval, TWIA "strongly stated" that the worker would be "released." Otherwise, TWIA told the workers not to tell the company if they were going to work on a Sunday. Additionally, the companies state that during this time the workers were "free to choose when they started work for the day, took lunch, and ended work for the day."

For the workers' services, OCC invoiced TWIA and paid the workers non-negotiable day rates ranging between $500 and $1200. By August 2019, all the workers completed their assignments and were no longer working for TWIA.

Less than a year later, Galarza brought this action seeking damages for unpaid overtime labor. Both Wimberly and Carpenter joined the action. In their complaint, they alleged that they were misclassified as independent contractors instead of employees and were not paid overtime for any week in which they worked more than 40 hours.

The workers and the companies filed cross motions for summary judgment. The district court then assessed six factors to determine whether the workers were employees protected by the FLSA or independent contractors outside its scope. *See Scantland,* 721 F.3d at 1311–12. It concluded that four factors weighed in favor of independent contractor status and two in favor of employee status—although one of the factors in favor of employee status was entitled to little weight. The district court granted the companies' motion for summary judgment because the "undisputed evidence,

viewed as a whole, more definitively supports the determination"
that the workers were independent contractors. The workers
timely appealed.

## II.

We review the grant of summary judgment *de novo*, constru-
ing all facts and reasonable inferences in the light most favorable to
the nonmoving party. *Brucker v. City of Doraville*, 38 F.4th 876, 881
(11th Cir. 2022).

## III.

We conclude that the district court did not properly weigh
the *Scantland* factors. To determine whether a worker qualifies as
an "employee" and is thus entitled to overtime wage protection
under the FLSA, we assess the economic reality of the relationship
and whether the worker is economically dependent on the alleged
employer under the totality of the circumstances. *Scantland,* 721
F.3d at 1311. To this end, we have recognized an inexhaustive set
of six factors that guide our analysis. *Id*. at 1311–12. But no one fac-
tor dominates, and even the sum of factors should be rejected if
they do not reflect the economic reality. *Usery v. Pilgrim Equip. Co.*,
527 F.2d 1308, 1311 (5th Cir. 1976). After considering the circum-
stances in the light most favorable to the workers, the factors sug-
gest the workers were economically dependent on the companies,
and a jury could reasonably conclude that the workers were em-
ployees.

### A.

We start with some legal context. Under the FLSA, employees are entitled to overtime pay for any time worked in excess of 40 hours per week. 29 U.S.C. § 207(a)(1). But this benefit applies "only to 'employees,' a term given rough outline by a series of broad definitions in the Act." *Scantland*, 721 F.3d at 1311 (citing 29 U.S.C. § 207). Specifically, an "employee" is "any individual employed by an employer." 29 U.S.C. § 203(e)(1). An "employer" is "any person acting directly or indirectly in the interest of an employer in relation to an employee[.]" *Id*. § 203(d). And "employ" "includes to suffer or permit to work." *Id*. § 203(g). Critical to the present dispute, we have previously explained that the definition of "employee" does not include independent contractors. *Scantland*, 721 F.3d at 1311 (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 728–29 (1947)).

To distinguish between "employees" and independent contractors, and therefore to draw a line between who gets FLSA overtime protection and who does not, we examine the relationship between the worker and alleged employer. In particular, we apply the "economic reality test" and assess "the 'economic reality' of the relationship . . . and whether that relationship demonstrates dependence." *Id*. at 1311–12 (citation omitted). True to the name, we care about *reality*, not possibility. That is, the relationship is not determined by the "label" the parties use, *id*. at 1311, or "how one *could have acted* under the contract," *Usery*, 527 F.2d at 1312 (emphasis

added) (internal quotation marks omitted). Instead, we focus on how the parties actually behaved. *Id.*

To guide this analysis, we have recognized a set of six factors. *See Scantland*, 721 F.3d at 1311–12. These factors are: (1) the nature and degree of the alleged employer's control over the manner in which work is performed; (2) the worker's opportunity for profit or loss depending on managerial skill; (3) the worker's investment in materials or hiring additional workers as necessary to complete his task; (4) whether the worker's job requires a special skill; (5) the permanency and duration of the relationship between the worker and alleged employer; and (6) the extent to which the worker's services are an integral part of the alleged employer's business. *Id.* at 1312.

These factors are not exhaustive and merely "serve as guides." *Id.* We must consider the relationship "under all the circumstances." *Garcia-Celestino v. Ruiz Harvesting, Inc.*, 843 F.3d 1276, 1287 (11th Cir. 2016) (citing *Aimable v. Long & Scott Farms*, 20 F.3d 434, 439 (11th Cir. 1994)). As a result, no one factor is controlling, and the weight assigned to each factor "depends on . . . the putative employee's dependence on the alleged employer, which in turn depends on the facts of the case." *Scantland*, 721 F.3d at 1312 n.2. Nor can the sum of the factors ever outweigh the ultimate inquiry: whether the worker is economically dependent on the alleged employer. *See Usery*, 527 F.2d at 1311.

The workers and companies debate whether another set of factors are appropriate to consider in this situation. The workers

contend that we can consider eight factors that we first announced in *Aimable*. *See* 20 F.3d at 443–44; *Garcia-Celestino*, 843 F.3d at 1294 (distilling factors into list of eight). These factors place a stronger emphasis on the alleged employer's perspective rather than the worker's perspective, but otherwise they mostly overlap with the *Scantland* factors. *Compare Garcia-Celestino*, 843 F.3d at 1294, *with Scantland*, 721 F.3d at 1312. The companies, on the other hand, insist that we should not consider these arguments because these factors are used to determine whether an entity is an "employer" and not whether a worker is an "employee." To their point, we recognized in *Aimable* itself that the relevance of the *Scantland* factors and *Aimable* factors may depend on the particular facts of the dispute. *See Aimable*, 20 F.3d at 443–44 (acknowledging that *Aimable* factors were better suited than some *Scantland* factors because the *Scantland* factors "show[ed] that appellants were employees, but not of whom"). We agree with the companies. To the extent the *Aimable* factors overlap with the *Scantland* factors or are otherwise applicable to the particular facts of a dispute, a court would not be barred from considering them among the totality of the circumstances. But here, like most other cases in which we must determine whether a worker is an employee rather than identify which entity is the employer, the *Scantland* factors drive our analysis. And under the *Scantland* factors, the workers survive summary judgment because a jury could reasonably conclude that they were either employees or independent contractors.

*B.*

Now, we apply the factors. The district court concluded that four factors favored independent contractor status and two favored employee status, although one of those two was entitled to little weight under the circumstances. But when we consider the facts in the light most favorable to the workers, we see things differently. By our count, five factors favor employee status, and only one favors independent contractor status. So, on this record, a jury could reasonably conclude that the workers were employees.

1.

The first *Scantland* factor considers "the nature and degree of the alleged employer's control as to the manner in which the work is to be performed." 721 F.3d at 1312. The alleged employer's control must be significant to support employee status, and control is significant if it reveals that the alleged employee does not stand as a "separate economic entity" who is "in business for [itself]." *Id.* at 1313 (citation omitted). Some indicia of significant control include whether the alleged employer controlled how much the workers were paid, how many hours they worked, how many days they worked, their daily work schedule, and if they could work for others, in addition to whether the alleged employer closely monitored the quality of the work. *Id.* at 1315. Based on the requirements imposed by the companies, this factor suggests that the workers were employees.

The record suggests that the companies controlled the workers to the point where they did not stand as separate economic entities who were in business for themselves. For starters, the companies controlled the workers' schedules and hours. The workers claim that TWIA set their work schedules, reviewed their timesheets, and had the ability to dock pay for unreported absences or tardies. To enforce these schedules, the workers claim that TWIA used software to track "performance metrics" including "when [they] were working, how fast [they] typed, and how many words [they] typed." Additionally, the workers testified that TWIA "controlled and directed [their] day-to-day tasks."

Even though the policies changed during the shift to remote work, the companies still exercised significant control. During that shift, the companies threatened to fire the workers if they were caught working on Sunday without prior permission. And even if the structured hours relaxed after the transition to remote work, the workers' testimony, viewed in the light most favorable to them, suggests that they maintained their regimented hours. That is, the workers testified that they were "required" to work "8-6 on Monday through Friday and 8-5 for Saturdays and Sundays," but the only difference in remote work was that they could not work on Sunday without prior authorization. *See Usery*, 527 F.2d at 1312 (company exerted control over the work hours even if workers were free to set their own hours because the workers followed the company's posted "standard" hours).

The companies try to undermine these facts by distinguishing control over the "manner in which the work is to be performed," *Scantland*, 721 F.3d at 1312, from control over the work "parameters," including hours and scheduling. But this distinction flies in the face of our settled precedent. In *Scantland*, we said that the control factor leaned in favor of employee status partly because the alleged employer controlled "how many hours [the plaintiffs] worked, how many days they worked, [and] their daily work schedule[.]" *Id*. at 1315. And in *Usery,* we reached the same conclusion, in part because "even the hours [were] 'controlled'" by the alleged employer. 527 F.2d at 1312. Therefore, the jury could consider these time constraints when weighing the control exercised by the companies.

In addition to managing the workers' daily schedule, the companies also controlled how the workers performed their tasks and limited their ability to work for other companies. For example, the workers could not complete their tasks—that is, resolve insurance claims—without first consulting with and getting approval from the companies. Furthermore, the workers may have been free to market their services to other companies not already associated with TWIA or OCC, but in reality, they did not work for anyone else during their employment. *See id.* ("It is not significant how one 'could have' acted under the contract terms. The controlling economic realities are reflected by the way one actually acts."). While they worked for the companies, the workers were paid nonnegotiable day wages. And, even though Carpenter quit multiple times so that she could work for other insurers, this discontinuity

underscores that the workers did not work for other companies while working for TWIA and OCC.

Based on these facts, a jury could reasonably conclude that the companies exerted sufficient control over the manner in which the workers performed their tasks so as to suggest that the workers were not a "separate economic entity" distinct from the companies. *Id*. at 1313.

2.

Next, we consider whether the workers had an "opportunity for profit or loss depending upon [their] managerial skill." *Scantland*, 721 F.3d at 1312. The key element for this factor is the source of the opportunity. That is, we consider whether the workers can "earn additional income through their own initiative" by negotiating a rate, selling additional goods or services, or similar methods. *Id*. at 1317. But the workers' ability to earn more because they are "more technically proficient" does not speak to their economic independence. *Id*. Because the workers could do nothing to influence wages, this factor indicates that they were likely employees.

The workers had no control over their paychecks. As previously mentioned, the companies paid them non-negotiable, fixed day wages. And nothing in the record suggests that they could have earned more based on their own initiative. True, the workers were "responsible for all personal and professional expenses" including licensing and membership fees, car and travel expenses, insurance premiums, food, lodging, and internet and cell phone service. Although some of these expenses have a conceivable connection to

business, many of them are little more than personal expenses, such as food, transportation, and cell phone service. And cutting costs where possible on mostly personal expenses to *save* money has nothing to do with a worker's ability to *"earn additional in-come,"* let alone the ability to do so through initiative and managerial skill. *Id.* (emphasis added); *see Usery*, 527 F.2d at 1313 ("Such minor additional income made from work which is not connected with the actual business under examination is not relevant to a court's determination of employee status."). An employee has just as much freedom as an independent contractor to budget in his personal life.

The companies weigh heavily the fact that the workers claimed tax deductions as independent contractors for their business expenses, but the significance is overstated. For starters, a worker can be an employee for FLSA purposes but an independent contractor for other federal law purposes. In the FLSA context, "[t]he common law concepts of 'employee' and 'independent contractor' have been specifically rejected as determinants of who is protected by the Act." *Usery*, 527 F.2d at 1311; *Aimable*, 20 F.3d at 439 ("To determine whether an employer/employee relationship exists for purposes of federal welfare legislation, we look not to the common law definitions of those terms . . . but rather to the 'economic reality' of all the circumstances" concerning economic dependence.). But in other settings, we embrace those common law principles. *See, e.g.*, *Cobb v. Sun Papers, Inc.*, 673 F.2d 337, 340–41 (11th Cir. 1982) (In the Title VII context, the "economic realities with respect to the dependence of the individual on the

employment" do not control, but rather "the economic realities of the relationship viewed in light of the common law principles[.]"); *NLRB v. Associated Diamond Cabs, Inc.*, 702 F.2d 912, 918 (11th Cir. 1983) ("Determination of a worker's status [under the National Labor Relations Act] must be made by reference to the principles of the common law of agency."); *Hosp. Res. Pers., Inc. v. v. United States*, 68 F.3d 421, 424 (11th Cir. 1995) (For tax purposes, "[t]raditionally, common law rules served as the basis for the classification of particular workers or classes of workers as employees or independent contractors."). Due to these differences, the Supreme Court has recognized that the "striking breadth" of the definition of "employee" under the FLSA "stretches the meaning . . . to cover some parties who might not qualify as such under a strict application of traditional agency law principles." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992).

In any event, even if the legal concepts matched, the label that the workers used on their taxes would not control our analysis. The entire point of our caselaw is that we don't care about "the 'label' put on the relationship by the parties." *Scantland*, 721 F.3d at 1311; *Donovan v. Tehco, Inc.*, 642 F.2d 141, 143 (5th Cir. Unit A Apr. 1981) ("[T]he label attached to the relationship is dispositive only to the degree that it mirrors the economic reality of the relationship."). We look to economic realities, not labels.

Finally, the companies' arguments are far afield from the usual considerations under this factor. When we assess workers' opportunities for profit or loss, we consider things like whether the

workers could "negotiate or otherwise determine the rates they were paid for jobs," whether they could "upsell" additional services to clients, and whether they could "pair[ ] up" or "trad[e] jobs" with other workers. *Scantland*, 721 F.3d at 1317. We have also considered whether the worker had control over "the amount of business done" through "convenience of hours, extra service provided, and rapport with customers." *Usery*, 527 F.2d at 1313. These elements all share a nexus with the actual work being done, not cutting personal expenses or claiming tax deductions. And they all point toward characterizing the workers as employees.

Ultimately, nothing in the record suggests that the workers had an ability to influence their income based on their own managerial skills.

3.

Third, we assess the workers' "investment in equipment or materials required for [their] task[s], or [their] employment of workers." *Scantland*, 721 F.3d at 1312. To do so, we can "evaluate the relative investments of the [alleged employer] and the [workers] because such an analysis might shed light on whether the workers were economically dependent on [the alleged employer]." *Layton v. DHL Express (USA), Inc.*, 686 F.3d 1172, 1176 (11th Cir. 2012) (citing *Aimable*, 20 F.3d at 443). *But see Scantland*, 721 F.3d at 1317–18 (reviewing workers' investment partially in isolation by considering whether they had the ability to employ workers). The workers had no ability to employ others, nor did they heavily

invest in the equipment and materials necessary for the job compared to the companies.

The companies' and workers' relative investments suggest that the workers were employees. Both sides apparently recognized that this work was "not a capital intensive endeavor and is accomplished with computers, telephones, and software." But the companies generally provided these materials. Specifically, they supplied the workers with computers, telephones, email accounts, and ID badges that they were required to use while working in-person. According to the workers, they also had to rely on the companies' computer network and applications in order to access and complete their assignments. True, the workers were responsible for "all personal and professional expenses" including state adjusting license fees, business license fees, membership fees and dues, car and travel expenses, and insurance premiums. But the investment factor considers the cost of "equipment or materials" or "employment of workers," not all costs associated with a profession. *Scantland*, 721 F.3d at 1317. And when it comes to equipment and materials—computer, laptop, email, network, applications, and software—the companies provided the bulk.

To be fair, when working from home, the workers were required to provide "their own workspaces and equipment"—including electricity, Internet and phone service, computers, and cellphones. But even so, the companies still provided the necessary software, networks, and accounts. At most, the workers used their own personal phones, computers, and utilities while working

remotely (that is, assuming they no longer had access to the computers and phones the company originally provided). And there is no reason to believe, on this record, that the workers had to make special investments in these personal items. *See id.* at 1318 (recognizing "little need for significant independent capital" when workers were required to own vehicles but already owned suitable work vehicles); *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1052 (5th Cir. 1987) (Using already owned equipment or making "minor purchases . . . for nonbusiness purposes," even though they had business applications, "do[es] not indicate legally significant investment by the [workers]."); *id.* at 1051 (Using a computer for work "involved no investment because [the worker] originally had purchased the home computer for school work."); *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 810–11 (6th Cir. 2015) (citing *Scantland*, 721 F.3d at 1317–18) (Unlike "computer equipment" and other tools that "many people have for personal use," "investment in something like welding equipment signals a greater degree of economic independence because it is not a common item that most people use daily.").

Drawing all reasonable inferences in favor of the workers, a jury could weigh this factor in favor of employee status.

### 4.

Fourth, we ask whether the job requires a "special skill." *Scantland*, 721 F.3d at 1312. The extent to which the companies provided training is disputed, but it is undisputed that the workers came to the relationship with special training and a license from

the state to work in this field. That the workers acquired these skills and licenses before their TWIA assignment supports the idea that they could be independent contractors. *Cf. id.* at 1318 ("The meaningfulness of this skill as indicating that plaintiffs were in business for themselves or economically independent, however, is undermined by the fact that Knight provided most technicians with their skills."). In some circumstances, state license and certification by professional associations "weighs heavily in favor of independent contractor status." *Schwieger v. Farm Bureau Ins. Co.*, 207 F.3d 480, 485 (8th Cir. 2000). *But see United States v. Technic Servs., Inc.*, 314 F.3d 1031, 1051 (9th Cir. 2002) ("Licenses and certification requirements—which commonly are justified on grounds of public health and safety—cover many activities, including quite ordinary ones like driving a car."); *Adelberg v. Berkshire Life Ins. Co.*, 97 F.3d 470, 471 n.3 (11th Cir. 1996) ("Florida law requires that a yacht salesman obtain a license[.]"); *Velarde v. GW GJ, Inc.*, 914 F.3d 779, 782 (2d Cir. 2019) ("To offer commercial cosmetology services in New York, an individual must obtain and maintain a State cosmetology license."); La. Stat. Ann. § 3:3808(A) ("A person . . . engaging in the arborist profession shall be required to obtain a license[.]"). Although a reasonable jury could discount the weight of this factor, we conclude it weighs in favor of classifying the workers as independent contractors.

### 5.

Fifth, we determine "the degree of permanency and duration of the working relationship." *Scantland*, 721 F.3d at 1312. In

addition to temporality, "[e]xclusivity is relevant" to this analysis. *Id*. at 1319. Based on the record, the companies retained the workers for an indefinite and extendable period of time during which the workers did not service any other companies, supporting employee status.

TWIA retained the workers for an indefinite period of time akin to at-will employment. A TWIA manager testified that the company retained these additional workers "to deal with the spike in claims in a timely fashion" after Hurricane Harvey. And the contract indicates that TWIA engaged the workers for a "separate temporary assignment" of indefinite duration, "determined by TWIA." In other words, the contract was not set to expire upon the completion of a specific claim, a certain number of claims, or even all Hurricane Harvey related claims. Instead, based on the contract's terms and TWIA's stated intent, TWIA hired more workers in response to increased demand. Employers do this all the time. When there is higher demand, they hire more workers. And when the workforce outpaces demand, they lay off those workers.

The economic reality confirms that the workers had a reasonably permanent relationship with the companies. Specifically, the workers serviced the companies for about two years, could have extended the relationship, and did not work for anyone else during that time. This arrangement is analogous to the one we considered in *Usery*. *See* 527 F.2d at 1314. There, we determined that the workers had a permanent relationship with the alleged employers when they signed one-year contracts that were routinely

extended. *Id*. Although the terms of the contract in this case state that the workers were "temporarily engaged" in "separate and standalone" assignments that would "terminate upon completion," the economic reality—not the form—controls our analysis.

On the whole, these facts suggest that the workers had a permanent relationship with the companies that aligns with employee status.

### 6.

The final factor is "the extent to which the service rendered is an integral part of the alleged employer's business." *Scantland*, 721 F.3d at 1312. And here, the significance of the workers' services is apparent. The workers are insurance claim adjusters both for an insurance company and for a company that provides adjusters to insurance companies. By adjusting claims for TWIA, the workers allow TWIA to administer its insurance policies. And with regards to OCC, the company exists to provide insurance claim adjusting services to insurers. Essentially, the workers *are* the goods that OCC provides. As even the companies recognize, without the workers' services, the outsourcing company has nothing to sell and the insurers can't perform their central function of resolving insurance claims.

Because of the workers' central role in both TWIA's and OCC's businesses, a jury could weigh this factor heavily in favor of employee status.

7.

In sum, when we view the facts in the light most favorable to the workers, the factors support the workers' claim that they are "employees" under the FLSA. On one hand, the work required special skills—a factor that may cut in favor of independent contractor status. But, on the other hand, the companies exercised substantial control over the manner in which work was performed, the workers did not have a meaningful opportunity for profit or loss based on managerial skills, they did not make meaningful investments in the equipment and materials needed for work, they had an indefinite relationship with the companies that lasted for years, and their services were integral to the companies' businesses—five factors that favor employee status.

Even aside from the factors, our bottom-line inquiry into employee status is whether a worker is economically dependent on the putative employer under the totality of the circumstances. Here, taking the facts in a light most favorable to them, the workers acted more like employees depending on an employer than independent contractors with their own businesses. They adjusted claims for a single insurance company on a full-time basis for about two years under an indefinite at-will contract; they had no opportunity to work for anyone else without terminating that relationship; and they had little to no control over their hours or rate of pay. To be sure, they used their own cars and phones and maintained their own licenses. But, if a jury could not reasonably find that the workers were economically dependent under these facts,

23-13205              Opinion of the Court                    25

it's not clear that a professional working from home could ever establish economic dependence under the FLSA.

## IV.

We **REVERSE** and **REMAND** for further proceedings.

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

October 16, 2025

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  23-13205-CC
Case Style:  Joel Galarza, et al v. One Call Claims, LLC, et al
District Court Docket No:  1:21-cv-00250-N

Opinion Issued
Enclosed is a copy of the Court's decision issued today in this case. Judgment has been entered today pursuant to FRAP 36. The Court's mandate will issue at a later date pursuant to FRAP 41(b).

Petitions for Rehearing
The time for filing a petition for panel rehearing or rehearing en banc is governed by 11th Cir. R. 40-2. Please see FRAP 40 and the accompanying circuit rules for information concerning petitions for rehearing. Among other things, **a petition for rehearing <u>must</u> include a Certificate of Interested Persons**. <u>See</u> 11th Cir. R. 40-3.

Costs
Costs are taxed against Appellee(s) / Respondent(s).

Bill of Costs
If costs are taxed, please use the most recent version of the Bill of Costs form available on the Court's website at www.ca11.uscourts.gov. For more information regarding costs, <u>see</u> FRAP 39 and 11th Cir. R. 39-1.

Attorney's Fees
The time to file and required documentation for an application for attorney's fees and any objection to the application are governed by 11th Cir. R. 39-2 and 39-3.

Appointed Counsel
Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation via the eVoucher system no later than 45 days after issuance of the mandate or the filing of a petition for writ of certiorari. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Clerk's Office Phone Numbers
General Information:    404-335-6100      Attorney Admissions:         404-335-6122
Case Administration:   404-335-6135      Capital Cases:               404-335-6200
CM/ECF Help Desk:      404-335-6125      Cases Set for Oral Argument: 404-335-6141

OPIN-1 Ntc of Issuance of Opinion